# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA ex rel. TENISHA CARTER, )
)
)
Petitioner, )
)
v. )
)
CAROLYN TRANSCOSO, Warden, )
Dwight Correctional Center, )
)
Respondent. )

No. 10 C 1270

The Honorable William J. Hibbler

## MEMORANDUM OPINION AND ORDER

Tenisha Carter seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. She bases her petition on the following grounds: (1) the admission of her confession was a violation of her Fifth Amendment rights as it was not voluntary; (2) she did not knowingly or intelligently waive her *Miranda* rights; (3) she was unlawfully seized without probable cause, in violation of the Fourth Amendment, and the trial court should have suppressed the statements she made as a result of that seizure; (4) the trial court's admission of and failure to strike evidence relating to crimes for which she was not charged violated her Sixth Amendment right to a fair trial; (5) the automatic transfer provision of the Illinois Juvenile Court Act, 705 ILCS 405/5-130, which caused her to be tried in adult criminal court, is unconstitutional; (6) her right to due process was violated when the State failed to notify her counsel of a police report until the first day of her trial; (7) her right to due process was violated by the State's failure to provide copies of documents obtained from the Cook County Jail to her counsel; (8) her Fourteenth Amendment rights were violated by the improper admission of writing that was not properly authenticated; and (9) the cumulative effect of a variety of erroneous evidentiary rulings by the trial court was a

violation of her confrontation and due process rights. For the following reasons, the Court DENIES Dorado's petition.

## I. Background

On June 23, 2004, following a jury trial in the Circuit Court of Cook County, Illinois, Petitioner Carter was convicted of first degree murder. She was sentenced to thirty years' imprisonment. She appealed the decision on a number of grounds, and her conviction and sentence were affirmed by the Illinois Appellate Court on June 30, 2008. She then filed a Petition for Leave to Appeal (PLA) to the Illinois Supreme Court, which the Court denied on November 26, 2008. She now challenges her conviction here pursuant to 28 U.S.C. § 2254. The facts set forth below are drawn in large part from the relevant portions of the Illinois Appellate Court's statement of the facts. *See People v. Carter*, No. 1-04-3443, slip op. at 2-24 (Ill. App. Ct. June 30, 2008). The Court presumes these facts to be true absent a showing to the contrary by Carter by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Whitman v. Bartow*, 434 F.3d 968, 969 (7th Cir. 2006).

Carter was convicted of the murder of her roommate, Brandy Thompson, which occurred in December of 2000. At the time, Carter, who was 16 years old, shared an apartment with Thompson, 19, in Chicago. Carter did not live with a guardian. On the morning of December 2, 2000, a neighbor found Thompson's body underneath the bumper of a car parked in an alley near their apartment. Her body was covered from the head to the waist with leaves, and from the waist to the feet by a large slab of concrete. A Chicago Police Forensic Investigator that reported to the scene found two pools of blood nearby, and recovered one fingerprint and a red stain from the bumper of the car. The autopsy of the body revealed that Thompson had abrasions on her

head and face and at least 117 stab and incise wounds. No fingerprint, DNA, or other physical evidence collected was ever linked to Carter.

At 5:40 a.m. on December 4th, Chicago police detectives picked up Carter from her grandmother's house and took her to the Area 4 police station. They testified at her trial that they initially questioned her as a witness because she was the roommate of the victim and did not suspect her of committing the murder at the time. At the station, Carter provided contact information for her father to Office Riordan, one of the officers who played a significant role in investigating Thompson's murder. Carter's father, Calvin Robinson, has never been Carter's legal guardian and Carter has never lived with him. He later explained to the officers that Carter's mother was incarcerated at Cook County Jail and, thus, unavailable.

The officers at the station did not provide Carter with the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), for persons under arrest (her "*Miranda* rights"). She was not told she was free to leave the station, or that she did not have to answer the questions she was asked by detectives. Robinson later arrived at Area 4, but there was no other adult, legal guardian, youth officer, or lawyer present with Carter that day. At trial, there was conflicting testimony as to how long Robinson was allowed to speak with his daughter and whether he was present during any of the police questioning.

During that day's questioning, Carter told Officer Carney, another officer involved in the investigation, that she had been in her apartment with Thompson and others on the night of December 1st. She said that after drinking and smoking marijuana, the others left. Then, another individual named Tyrone Weeks came over with more marijuana, and smoked it with Carter and Thompson. After they finished, Weeks left Carter and Thompson alone. According to Carter, Thompson then left on her own at around midnight with plans to take the bus to visit her

boyfriend, Timothy Watkins. Carter said that after Thompson left, she never saw her again. She said she spoke to Watkins the next day and that he was worried because Thompson never arrived. She also said that another boyfriend of Thompson's, Darnell, came to her apartment looking for Thompson as well. Carter said she did not hear of Thompson's death until December 4th.

After questioning, the police released Carter to her father's custody and she returned home with him. A few hours later, Carter's apartment building caught fire. Arson investigators determined that the fire was intentionally set with the aid of an accelerant, and that it originated in the rear bedroom of the basement apartment, where Carter and Thompson lived. The investigators determined that the accelerant used was probably lighter fluid, and found bottles of lighter fluid at the scene. They recovered fingerprints from the bottles, but they did not match those of Carter, or any of nine other parties the police tested them against.

On December 5th and 6th, the police interviewed Thompson's cousin and the woman who lived in the apartment above Carter and Thompson. Both witnesses gave information that contradicted Carter's version of events. However, despite these inconsistencies, Officer Carney stated that he did not doubt Carter's story at the time.

On December 10th, police detectives took Carter to Area 4 again. They made repeated attempts to contact her father, but were unable to reach him and proceeded to interview her without the presence of a parent, guardian, or youth officer. Officer Riordan interviewed Carter in the presence of her boyfriend and another police officer. The officers did not read her *Miranda* rights, tell her she did not have to answer questions, or tell her that she was free to leave the station. Officer Riordan testified that at the time he still considered her a witness, not a suspect.

During the interview, Carter largely repeated her earlier statement, but added that Weeks returned to the apartment at 3 a.m., that he was drunk, and that he grabbed Carter before leaving. She also added that she heard Weeks say he was going to rob Thompson the day before the murder. Carter's boyfriend told Officer Riordan that Carter told him she saw Weeks coming out of Thompson's bedroom at around 12:30 a.m. on the night of the murder. After Carter agreed to spend a couple hours reviewing photographs of people Officer Riordan had come across during his investigation, the police were still unable to reach her father and released her and her boyfriend to her boyfriend's father.

On December 18th, Officer Riordan drove to Robinson's home to try to speak with Carter again. Robinson told the police that he was concerned for his daughter's safety because of the murder and arson. He told them he believed Carter knew who killed Thompson. He also told them that Carter rarely stayed there and that he could not control her or prevent her from running away. On December 20th, he called the police and gave them an address and phone number where they could find Carter. Officers Riordan and Carney went to the address and were greeted at the door by a woman in her mid-twenties holding a knife. The woman asked them if they were responding to a domestic violence call she had made. They told her they were not, but that they wished to speak to Carter. The woman let them in, and as they entered, Carter saw them and told Officer Riordan that she had been trying to call him. She agreed to accompany the officers to Area 4 and got into the back of the squad car without being searched or handcuffed. The officers did not tell Carter that she did not have to accompany them or that she could contact a parent, an attorney, or a youth officer. The police testified that they still regarded Carter as a witness, not as a suspect.

At the police station, the officers placed Carter in an unlocked interview room while they attempted to contact her father. After failing to reach Robinson, they contacted the Youth Division at Area 4, who sent Youth Officer McDonough to speak with Carter. Officer McDonough spoke with Carter briefly, but then told the other officers that his presence was unnecessary if Carter was only a witness. Officer McDonough was not present from that point on.

Carter remained at the station for 55 hours. She was questioned again the first day and indicated that she had originally lied about her 3 a.m. confrontation with Weeks because she was afraid of him. After she admitted to lying, Officer Riordan asked her whether she would take a polygraph examination and she agreed. She was the only person involved in the investigation who was asked to take a polygraph. The police were not able to reach Robinson until 11 p.m. that night and at that time Officer Carney told Robinson they wanted to give Carter the polygraph the next day at 1 p.m. Carney asked Robinson permission to drop Carter off for the night, but Robinson said that he was concerned for Carter's safety and thought she would run away if she was brought to his house. Robinson testified that he never asked if Carter could spend the night at the station. Officer Riordan initially testified that Robinson asked if Carter could stay at the station, but later testified that Carter had asked if she could stay. Officer Carney obtained special permission from his supervisor to allow Carter to spend the night in an unlocked interview room. Carter spent the night alone in the room and the police never told her she was free to leave.

During her time at the station, the officers generally allowed Carter to move around the station freely, but she was required to have an escort whenever she used the bathroom. Carter was not given a change of clothes or access to a shower. She was menstruating, and asked the

officers for feminine products. Officer Riordan provided her with a box of tampons. She slept on a bench in the interview room without a pillow or blanket.

The following morning, the police picked up Robinson and brought him to Area 4. The officers testified that Robinson was allowed to speak with Carter alone for 45 to 60 minutes, but Robinson testified that he had to wait for hours before he could see Carter and was only able to speak with her for a few minutes. Robinson also testified that he was kept separate from his daughter.

Officer Riordan once again asked Carter if she was willing to take a polygraph test. Robinson told Carter that it was her decision, and she agreed to take the test. Around 1:45 p.m., the officers drove Carter and Robinson to the polygraph officer, and Youth Officer McDonough met them there. The polygraph examiner required that both a parent and a youth officer be present. Before beginning the examination, the examiner read Carter her Miranda rights and asked if she understood each right before reading the next one. He also read the entire consent form to Carter and asked if she understood it. He finally conducted a pretest interview where he inquired about her health, how much she had slept, and whether she had used drugs recently. The results of the test indicated that Carter was being deceptive. When Carter heard the results of the test, she left the room crying, grabbed Officer Riordan's hand, and said, "John, I'm going to jail. Tyrone [Weeks] killed Brandy [Thompson] and he made me help clean up." She later elaborated, telling them that she saw Weeks coming out of Thompson's bedroom at 3 a.m. and that she saw that Thompson had been stabbed. She said Weeks threatened to kill her too, and demanded that she help him clean up. She said she was afraid of Weeks because he and his family were gang members. Robinson tried to calm Carter and told her that she would not go to

jail if Tyrone killed Brandy. Robinson testified that he did not remember Carter telling anyone that Weeks killed Thompson.

The officers brought Carter back to the roll call room at Area 4, where she was joined by Robinson and her two younger sisters. There, she had a meal and stayed with her family watching television, talking on the phone, and playing with typewriters.

Meanwhile, the police informed Assistant State's Attorney (ASA) Philip Dalmage that Carter was a witness to murder. Dalmage interviewed Carter in the presence of her father, her two younger sisters, and three officers. He read Carter her *Miranda* rights and asked if she had any questions for him or for her father. He informed her of her rights as a juvenile and told her that she could be tried as an adult. Carter and her father agreed to continue. Based on the information Carter provided in the interview, the police arrested Weeks at approximately 9 p.m.

Officer Riordan advised Carter to remain confined to the roll call room for her own safety as Weeks and some of his family members were arriving at the station. Carter stayed in the roll call room with her father and sisters, sill watching television and playing on the typewriter. While in the roll call room and in Carter's presence, Robinson asked an officer if there was any evidence recovered from the scene of the crime. Officer Carney replied that a fingerprint had been recovered from the bumper of the car where police recovered Thompson's body. He said that they had not identified the print. Soon thereafter, Carter handed a sealed note to Officer Carney. The note stated, "I lied again," and said that the morning after the murder, Carter and her boyfriend had gone to the apartment and tried to find Thompson, but that they found her dead and moved a brick that was on her feet. The note said that Carter was unsure if anyone had touched the bumper of the car, but that she had wanted to keep her boyfriend out of the

8

investigation. She apologized and expressed fear for her life. The note was excluded from evidence at trial.

The officers interviewed Weeks, and then spoke with Carter again with her father present. At 1 a.m., Robinson told the officers that he had to go home because of his young children. Robinson promised to return in the morning to be present for Carter's witness statement, but said that he would prefer if Carter stayed with them for the night and that he feared repercussions from Weeks's family. He said that he felt unable to control Carter and that he thought she was still not telling the whole truth. The parties dispute whether Carter was asked and agreed to stay that night. The police did not offer Carter a change of clothes, a blanket, a pillow, or a shower that night either.

At 2 a.m., on December 22, 2000, Carter asked to use the restroom. Officer Riordan escorted her to the bathroom. When they returned to the roll call room, Carter asked Riordan if Weeks was still in custody. When Riordan said that he was, Carter told him, "I killed Brandy. I got in a fight with Brandy over Darnell and while I was fighting I stabbed Brandy." She claimed that she had acted in self defense. Office Riordan asked her if Weeks had been involved at all and Carter told him that Weeks had not even been in the apartment that night.

Officer Riordan terminated his conversation with Carter and took her to an interview room and locked the door. Carter slept in the locked interview room from approximately 2 a.m. until 9 a.m. The next morning, at 9:30 a.m., Officer Riordan read Carter her *Miranda* rights in the presence of her father. He confirmed that she understood each right and was willing to speak to the officers. Before the officers asked her any questions, she turned to her father and said, "Dad, I killed Brandy." Robinson replied, "You're talking crazy girl. I should get you a lawyer." Carter responded, "No Dad, I did it."

During the ensuing interview, Carter explained that Thompson had started a fight with her and punched her in the face. She said that Thompson then went to the kitchen and got a knife and stabbed herself in the chest, and that Carter then followed her to her bedroom, took the knife, and continually punched Thompson. She said that was probably how she stabbed Thompson. That interview ended at 10:20 a.m. At around 11 a.m., Carter spoke with Detective Thomas Flaherty about the fire at her apartment for about 15 minutes. She admitted that she set the fire to conceal the fact that she stabbed Thompson.

At 1:30 p.m., Carter's mother arrived at Area 4 and they spoke until an ASA arrived. At 4 p.m., ASA Sean Baker interviewed Carter in the presence of both of her parents and Officer Carney. He introduced himself as a prosecutor and read Carter her *Miranda* rights and juvenile rights. Carter said that she understood her rights and agreed to speak with him. She told ASA Baker that the police had treated her well. She then told him about the night of the murder. This time she said that Thompson had attacked her with a knife. However, after the two had fought for a while, they grew tired and Thompson went to her bedroom. She said that an hour later she went to check on Thompson and Thompson attacked her again and placed her in a headlock. She said that she stabbed Thompson with the knife in order to free herself from the headlock. Then she said that she and her boyfriend moved Thompson outside. She said that they later set the apartment on fire to conceal the evidence. Although the interview room had videotape capabilities, ASA Baker did not videotape, tape record, or write out Carter's statement. He did not ask her to sign any statement. He also decided not to charge Carter at the time. Carter told ASA Baker about the murder at 4:30 p.m. and confessed to setting the fire at 10:30 p.m. Officer Carney informed Carter that she had not been charged at 11 p.m. and she was released. Carter

was formally arrested on charges of first degree murder and aggravated arson on January 5, 2001.

While in jail, Carter began an intimate relationship with a fellow inmate, Shirena Lando, which lasted about 15 months. At times they shared a cell, but Lando testified that when they did not they would communicate via letters known as "kites" that were sent through intermediary inmates with access to more than one cell block. Lando testified that she received more than 100 kites from Carter, and that she recognized Carter's handwriting from writing classes that they took together in jail. The prosecution introduced the contents of one of the kites through Lando. Lando testified that the kite contained a detailed description by Carter of how and why she committed murder. She did not name the victim, but she described a number of other circumstances that resembled the facts of Thompson's murder, including Carter's boyfriend's name, the wounds that Thompson suffered, and how Thompson's body was left under a car, covered with leaves. The facts did conflict somewhat with Carter's earlier confession and with the evidence recovered during the investigation, however. For instance, the author of the kites says she killed the victim because she had been stealing from the author to give to her boyfriend. She also suggests that she may have poured bleach into the victim's mouth, a fact that is belied by the autopsy conducted on Thompson's body.

The parties also presented expert testimony to the Court regarding Carter's confession and her understanding of her *Miranda* rights, some of which the Court admitted and some of which it excluded. This evidence and its significance is discussed in more detail below.

## II. Analysis

Respondent presents two types of arguments for why the Court should deny Carter's petition. First, she argues that Carter procedurally defaulted a number of her claims. Second,

she challenges the remaining claims on the merits. Finally, she also argues that if the Court denies Carter's petition, it should also deny her a certificate of appealability.

### A. Procedural default

As an initial matter, Respondent challenges a number of Carter's claims on the ground that they are procedurally defaulted because Carter failed to bring them through a full round of state court review. Before seeking federal habeas relief, a petitioner challenging her confinement pursuant to a state court judgment must give the State an "opportunity to pass upon and correct" violations of a petitioner's federal rights by "fairly presenting" claims of these violations in each appropriate state court. *Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004) (internal citations omitted). Any claims a petitioner fails to bring through one full round of state review are procedurally defaulted. *Lockheart v. Hulick,* 443 F.3d 927, 929 (7th Cir.2006). In Illinois, a full round of state review includes presentation of each claim in a PLA to the Illinois Supreme Court. *O'Sullivan v. Boerckel,* 526 U.S. 838, 845-46, 119 S. Ct. 1728, 1732-33, 144 L. Ed. 2d 1 (1999). Procedural default bars review absent a showing of cause for the default and actual prejudice resulting therefrom. *Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 2080, 135 L.Ed.2d 457 (1996). The only issue in this case is whether Carter procedurally defaulted her claims because she does not argue that she has met the standard for excusing default.

In her PLA, Carter presented the following four claims: (1) Carter was unlawfully seized without probable cause, in violation of the Fourth Amendment, and the trial court should have suppressed the statements she made as a result of that seizure; (2) the admission of her confession was a violation of her Fifth Amendment rights as it was involuntary; (3) the automatic transfer provision of the Illinois Juvenile Court Act, 705 ILCS 405/5-130, which

caused her to be tried in adult criminal court, is unconstitutional; and (4) a number of specific evidentiary rulings by the trial court effectively denied Carter the right to present a defense. The evidentiary rulings Carter challenged through this fourth claim were: (1) the exclusion of expert testimony concerning her confession at the police station; (2) the exclusion of photographs of the police station, including the room where she slept; (3) the admission of the "kite" through Lando without proper authentication or an opportunity to properly challenge its relevance; and (4) the court's decision to bar Carter's trial counsel from cross-examining ASA Baker as to why he refused to press charges immediately following Carter's confession. Thus, all other claims Carter presents in the instant petition are procedurally defaulted.

### B. Cognizability

Carter must carry a heavy burden even to show that her claim of involuntary seizure is cognizable on federal habeas review. The Supreme Court held in *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976), that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Thus, before addressing the merits of Carter's claim that she was unlawfully seized and that her confession should have been excluded as a result, the Court must determine whether the state courts afforded Carter a full and fair opportunity to be heard on the claim.

Carter argues that she was not given such an opportunity because the state trial court denied her the opportunity to present expert testimony by Dr. Solomon Fulero regarding false confessions. A person is seized "within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that

he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 545, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497 (1980). Dr. Fulero's testimony was offered to show that Carter's environment was coercive and likely to lead to a false confession given her mental state as a juvenile. While these issues are related, it is by no means clear that Dr. Fulero's testimony would have been directly on point, as Carter claims. In fact, it is telling that Carter does not rely whatsoever on evidence Fulero would have introduced in arguing that the state court improperly decided that there was no seizure until Carter confessed. Thus, the Court cannot find that the state court's evidentiary ruling regarding Dr. Fulero's arguably unrelated testimony, which Carter had the opportunity to contest in state court, deprived Carter of a full and fair opportunity to be heard. As a result, *Stone v. Powell* bars the Court from considering Carter's request for application of the exclusionary rule.

### C. Merits of the remaining claims

The Court will not grant a habeas petition of a person in custody pursuant to the judgment of a state court unless the state court's adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (irrelevant portions omitted). Section 2254(d)(1) also contains two prongs. Under the first prong, the Supreme Court has stated that a petitioner can only show that a state court's decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000). The Supreme Court interprets the second

prong to mean that a state court's decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* In other words, the Court may only grant a petition under the second prong if the state court's application of federal law is "not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S. Ct. 1, 4, 157 L. Ed. 2d 1 (2003). The petitioner's burden under Section 2254(d)(2) is also high, as the state court's factual findings are presumed to be true, and, as noted above, can only be rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Whitman*, 434 F.3d at 969. The Court need not even grant Carter an evidentiary hearing unless her allegations, if true, would render the state court's determination unreasonable. *See Rice v. Collins*, 546 U.S. 333, 341-42, 126 S. Ct. 969, 975-76, 163 L. Ed. 2d 824 (2006).

### 1. Voluntariness of confession

In determining whether a suspect gave a statement voluntarily, the Court must examine "the totality of the circumstances surrounding the interrogation." *Ruvalcaba v. Chandler*, 416 F.3d 555, 560 (7th Cir. 2005) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). While the question of whether a statement was voluntary is an especially sensitive one in cases involving juveniles, this standard applies in those cases as well, where the inquiry "includes evaluation of the juvenile's age, experience, education, background, and intelligence, and [considers] whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Id.* (brackets in original) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L. Ed. 2d 197 (1979)). The state appellate court explicitly applied these standards. *Carter*, No.

1-04-3443, slip op. at 28-29. Thus, the only question is whether the manner in which the court applied the standards was unreasonable.

Carter gave her initial confession unprompted by any questions from the police. She had been given the opportunity to speak with a youth officer and her father prior to her confession, and the polygraph examiner had read her *Miranda* rights at the time of the polygraph examination. Then, she was read her rights again before any further statements were taken. Her father also suggested that he hire an attorney for her, and she declined. While Carter presented expert testimony indicating that she did not fully understand her *Miranda* rights, the State presented expert testimony indicating that she did, and the state court found the State expert more credible. The state appellate court relied on all of these factors in determining that Carter voluntarily confessed to the crime. *Id.* at 30-33.

The Court will not substitute its assessment of credibility for that of the state court that heard the expert testimony in this case. Thus, the Court accepts the state courts' finding that Carter understood her *Miranda* rights. The Court also finds that the other factors discussed by the state court weigh in favor of finding the confession to have been voluntary. Carter's primary, and most compelling, argument, however, is that the state courts erred by failing to properly account for the fact that Carter was in the police station for 55 hours under conditions that were likely stressful and embarrassing. By the time she confessed, she had already spent one night at the station and was beginning her second night there. She was not given a blanket, pillow, a change of clothes, or access to a shower at a time when she was menstruating. She was repeatedly questioned, subjected to a polygraph examination, and never told that she could leave.

The state appellate court did not explicitly address these factors in ruling on the question of whether Carter's confession was voluntary. However, the court did address them in the

context of Carter's claim that she was unlawfully seized. *Id.* at 24-28. The court found that Carter was treated as a witness up until the time she confessed. *Id.* at 27. The court noted that she was allowed to move about the station most of the time, that the room where slept was not locked, and that she was allowed to see her father. *Id.* at 26. The court also noted that the police brought Carter to the station after finding her at the scene of a domestic dispute, and after she agreed to voluntarily accompany them and help with the investigation. *Id.* at 26-27.

The circumstances surrounding Carter's time at the police station were undoubtedly far from ideal, and certainly unfortunate. However, they were not necessarily coercive. At the time, Carter was apparently without a real place to call home, without an available legal guardian, and, according to her statements prior to the confession, scared of what might happen to her at the hands of the murderer. The state court's determination that she accompanied the police and cooperated with questioning voluntarily was not unreasonable. Once there, the fact that she spent the night in uncomfortable and potentially embarrassing conditions, and that she was never told she could leave, certainly weigh against a finding that her ultimate confession was voluntary. But other circumstances, such as the fact that her confession was not prompted by a question, and that she stood by the confession even after speaking with her father and hearing her *Miranda* rights a second time, suggest that the confession was voluntary. Taken in conjunction with the state court's finding that she understood her *Miranda* rights, the Court finds that the state court's holding was not unreasonable.

### 2. Constitutionality of the automatic transfer provision

Carter next challenges the constitutionality of the Illinois statute that provides for automatic transfer of juvenile defendants who were at least 15 years of age at the time of the charged offense to criminal court when they are accused of certain offenses, including first degree murder. *See* 705 ILCS 405/5-130. She contends that the statute caused a violation of her

constitutional right to due process. Her argument is essentially that by upholding and applying the provision, the state courts acted contrary to *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), and its progeny.

In *Roper*, the Supreme Court held that a state's imposition of the death sentence on an offender that committed the offense in question before the age of 18 is a violation of the Eighth and Fourteenth Amendments. *Id.* at 578-79; 125 S. Ct. at 1200. The Court found that the differences between juveniles and adults "render suspect any conclusion that a juvenile falls among the worst offenders." *Id.* at 570, 125 S. Ct. at 1195. Carter seizes on this comment, along with the Court's statement in *Graham v. Florida*, 130 S. Ct. 2011, 2031, 176 L. Ed. 2d 825 (2010), that "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed," and argues that through these statements the Court has indicated that the Constitution requires a specific hearing regarding the effects of a defendant's youth on her culpability before transfer to adult court. Notably, however, nowhere in either opinion does the Court make reference to the right to due process except in the context of the Fourteenth Amendment's incorporation of the Eighth Amendment against the states. The case certainly contains no direct holding that an automatic transfer provision such as the one here is a violation of those rights. *See, e.g., Graham*, 130 S. Ct. at 2030-31 (taking note of Florida's automatic transfer provision, but ruling only as to the constitutionality of sentence of life without parole for a juvenile who did not commit homicide).

Carter attempts to strengthen her claim by referencing *Kent v. United States*, 383 U.S. 541, 560-61, 86 S. Ct. 1045, 1057, 16 L. Ed. 2d 84 (1966), in which the Court held that a juvenile defendant was entitled to a hearing to determine whether the juvenile court's waiver of jurisdiction (and the corresponding transfer to adult criminal court) was appropriate. However,

the Court in that case was addressing the rights available to a juvenile defendant under the Juvenile Court Act of the District of Columbia. *Id.* The Court noted that under that particular statutory scheme, "non-criminal treatment is to be the rule – and adult criminal treatment, the exception which must be governed by the particular factors of individual cases." *Id.* The Court did not hold that every juvenile defendant, regardless of the statutory scheme at issue, was entitled to the same right under the Constitution.

In sum, the Court cannot find the state court's rejection of Carter's argument to be "contrary to" or an "unreasonable application of" the law that is clearly established by *Roper*, *Graham*, and *Kent*. One might reasonably conclude that, given the import of these precedents, the Supreme Court would likely find Carter's argument regarding the constitutionality of automatic transfer provisions persuasive. But, one might just as reasonably conclude the opposite given the fact that these cases contain no holding that is directly on point. This is especially true given the Court's failure to even remark about the possible due process implications of an automatic transfer provision in *Graham*, a case that involved such a provision. *See Graham*, 130 S. Ct. at 2030-31. Thus, the Court denies Carter's claim regarding the Illinois transfer statute on its merits.

### 3. Evidentiary rulings

Carter's final remaining claim is that certain evidentiary rulings by the trial court deprived her of her right to present a defense. Once again, the ruling she raised before the Illinois Supreme Court were: (1) the exclusion of expert testimony concerning her confession at the police station; (2) the exclusion of photographs of the police station, including the room where she slept; (3) the admission of the "kite" through Lando without proper authentication or an opportunity to properly challenge its relevance; and (4) the court's decision to bar Carter's

trial counsel from cross-examining ASA Baker as to why he refused to press charges immediately following Carter's confession.

Generally, evidentiary questions are not subject to review in habeas corpus proceedings because they only reach a level of constitutional import when they are "so prejudicial as to compromise the petitioner's due process right to a fundamentally fair trial." *Howard v. O'Sullivan*, 185 F.3d 721, 723-24 (7th Cir. 1999). In fact, the errors "must have produced a significant likelihood that an innocent person has been convicted." *Id.* at 724.

Two of Carter's claims fail because the state court came to a reasonable conclusion that the evidence excluded might interfere with the jury's role in finding facts and determining credibility. The trial court excluded Carter's expert, who would have testified about circumstances and police interrogation techniques that are likely to have a coercive effect on a juvenile, because the court found that the effect of the circumstances at issue in the case was not outside the realm of the jury's understanding. In other words, the court found that the jury could comprehend, without the aid of an expert, whether hours alone in a police station without a pillow, blanket, change of clothes, or access to a shower might have a coercive effect on a menstruating sixteen-year-old whose roommate was recently murdered. This is a reasonable conclusion, and the fact that the jury may have missed an opportunity to hear something more about the effect of these conditions does not lead to a significant likelihood that the jury actually convicted an innocent person.

Similarly, the trial court did not substantially prejudice Carter by denying her counsel the right to cross-examine ASA Baker as to why he refused to press charges immediately following Carter's confession. Testimony from Baker about his own assessment of Carter's credibility would likely interfere with the jury's determination of her credibility. Counsel was free to ask

about the circumstances surrounding Carter's confession and to elicit testimony from Baker about her demeanor or other evidence that might impact the jury's determination of credibility, but Baker's own determination was irrelevant.

The Court also rejects Carter's assertion that the trial court's exclusion of pictures of the Area 4 station where Carter stayed and the room where she was interviewed was sufficiently prejudicial as to give rise to a constitutional claim, even when considered in conjunction with her other claims of evidentiary errors. Carter does not claim that she was barred from eliciting testimony about the appearance of the rooms in question, and the added effect of pictures on the jury's understanding of the circumstances surrounding Carter's confession does not create a significant likelihood that she is innocent.

Finally, the Court turns to the trial court's decisions regarding the kite admitted through Lando. Carter argues that Lando did not properly authenticate the letter because she did not receive the letter directly from Carter and could not even remember who gave her the letter. However, Lando did testify that she recognized Carter's handwriting from other letters they exchanged and from having witnessed Carter writing during their writing classes. The State also introduced testimony by a handwriting expert that the writing matched that contained in other letters found in Carter's cell. Carter argues that this was also improper authentication as the State's witnesses were unable to conclusively establish that the letters in Carter's cell were written by her. Carter is correct that some of the evidence relied upon to support the letter's authenticity was circumstantial and there were grounds to challenge the authenticity of the letter in question. Nevertheless, so long as Carter was allowed to do that, the Court cannot conclude that the testimony by Lando and the handwriting expert were insufficient to support a finding by the jury that Carter actually wrote the letter.

Carter also argues that she was not actually given sufficient opportunity to contest Lando's testimony about the letter, however. She argues that she should have been allowed to present other kites between Carter and Lando to illustrate that Lando actually doubted that Carter was telling the truth in the letter where she allegedly described the murder, and that Lando was biased due to her failed romantic relationship with Carter. Carter's first argument suffers from the same problem as her argument that ASA Baker should have been able to testify about his beliefs as to Carter's credibility. Lando's evaluation of Carter's credibility was irrelevant and likely to interfere with the jury's determination of the same. As to her second argument, that she should have been able to introduce letters indicative of Lando's relationship with Carter in order to impeach her, Carter simply cannot prove the level of prejudice required in order to give rise to a constitutional claim. Lando herself testified as to her failed relationship with Carter and Carter was free to impeach her on the issue of bias. The evidence in the letter would have been duplicative.

For all of these reasons, the Court finds that the state court's rulings were reasonable, and any prejudice they may have caused to Carter, alone or in conjunction, fails to create a significant likelihood that Carter is in fact innocent.

### D. Certificate of appealability

According to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." In order to obtain a certificate of appealability, Carter must demonstrate that reasonable jurists could find the Court's ruling on his petition debatable. *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed. 2d 542 (2000). When a district court denies a claim because it was procedurally defaulted, the petitioner

must demonstrate not only that the merits of his underlying claim are debatable, but also that the ruling on procedural default is debatable. *Id.*

The Court finds that the majority of Carter's claims fail to raise an issue about which reasonable jurists could disagree. However, given the unusual and unfortunate circumstances surrounding Carter's interrogation, and the fact that the state appellate court did not address those circumstances in detail in ruling on Carter's claim that her confession was not voluntary, the Court grants Carter a certificate of appealability as to that claim alone. The Court stands by its determination that other indicia of reliability make a finding that Carter's confession was voluntary reasonable. Nonetheless, the Court is disturbed by the fact that a sixteen-year-old girl with no available legal guardian was subject to repeated questioning, sometimes without the benefit of *Miranda* warnings, while she was kept at a police station for 55 consecutive hours without access to basic comforts and amenities and without being told she was free to leave. The Court recognizes that reasonable jurists might disagree regarding the effects of these conditions.

### CONCLUSION

For the above reasons, the Court DENIES Carter's petition for a writ of habeas corpus. The Court GRANTS Carter a certificate of appealability as to her claim that her confession was not voluntary, but DENIES her a certificate as to her remaining claims.

IT IS SO ORDERED.

_4/28/11_
Dated

_Wm. J. Hibbler_
Hon. William J. Hibbler
United States District Court